FRANCIS X. HAZMAN *v.* THE HOBOKEN LAND AND IMPROVEMENT COMPANY.

It is negligence in a ferry proprietor not to provide a ferry bridge which can be raised and lowered with the tide, so as to be brought to a level with the boat while discharging its passengers; and it is negligence in a ferry proprietor to to order vehicles to be driven off the boat while it is at an unsafe distance above or below the level of the bridge.

Some time after the defendants' ferry boat arrived at the ferry house, and was fastened to the bridge, and while the arriving passengers were coming off the boat, the plaintiff, in making his way to the cabin of the boat, became wedged in the press of the on and off-going passengers, near the string piece which separated the passenger way from the carriage way of the boat. While in this position, he placed one foot over the string piece into the carriage way, and at that moment defendants' servant lowered the chain in front of the carriage way, and ordered the carts, &c., to be driven off. The bridge being eight or nine inches higher than the boat, one of the horses, in attempting to mount the step thus formed, fell upon the plaintiff, and crushed his leg. *Held,* that there was sufficient proof of negligence on the part of the defendants to go to the jury, and it was error not to submit the question of defendants' negligence to the jury.

Where the plaintiff, a passenger on the defendants' ferry boat, was crowded out of the passenger way into the carriage way of the boat, and it appears that the crowding and pushing of the passengers could have been prevented by the erection of a permanent division on the ferry bridge, restraining passengers from going to the boat until it was discharged of its arriving passengers, and by the erection of an effective barrier between the carriage way and passenger way of the boat, the court will not say, as matter of law, that it was negligence on the part of the plaintiff to be in the carriage way when injured.

APPEAL by the plaintiff from a judgment entered on a dismissal of the complaint at trial term.

This action was brought to recover of the defendants, as common carriers of passengers by steam ferry boats between New York and Hoboken, the damages alleged to have been sustained by plaintiff in consequence of an injury to his leg, occasioned by the falling of a horse upon it, on board of one of the defendants' ferry boats. The complaint alleges that the defendants carelessly and negligently caused the horse to be driven against the plaintiff; omitted to give any notice of its approach; omitted to land the horses and carts before admit-

ting plaintiff on the boat; omitted to prevent the overcrowding of the boat, pier, and bridge; omitted to provide proper safeguards against the horse; omitted to provide any place of retreat for said plaintiff from the horse; and omitted to take any precaution necessary for the safety of the plaintiff.

The answer admits that an injury was sustained by the plaintiff from an accidental collision with a horse driven by persons unknown, but denies every allegation whereby negligence or carelessness is imputed to the defendants, and avers that the injury was occasioned by the plaintiff's own negligence, in negligently and carelessly exposing himself upon that part of the boat appropriated to the use of horses and vehicles.

On the trial, the plaintiff having rested his case, defendants' counsel moved to dismiss the complaint, on the ground that the evidence was insufficient to show that plaintiff's injuries were occasioned by the negligence of the defendants, and on the ground that the plaintiff had contributed, by his negligence, to produce the accident. The court granted the motion solely on the latter ground. The plaintiff then appealed to the general term.

*Charles Wehle* and *Thos. Darlington*, for appellant.

*L. B. Woodruff* and *C. F. Sanford*, for respondents.

BY THE COURT.—DALY, F. J.—This is a close case, but I think there was enough in the evidence to entitle the plaintiff to go to the jury. The plaintiff testified that he was pushed down, with the rest of the passengers, to the end of the bridge, to the boat; that the people were crowding on and off the boat, because it stops only a few minutes after its arrival; and that he stepped on the boat, because he was pushed by the crowd that followed him. The part of the boat nearest the bridge is an open space, divided by a string piece, five inches high, upon which there are posts, with no chains between separating the passenger way from the carriage way. There is a large chain across the carriage way, and a small one across the passage way. As the plaintiff stepped upon the boat, the chain across the passage way was down, and an employee on

the boat, who had charge of the chain across the carriage way, threw it from the south side of the boat, where he was standing, to a post on the passage way, and called to the cartmen, "drive out." As the plaintiff came upon the boat, he was pushed back toward the left by ladies coming out of the cabin, and could not advance. He stepped upon the string piece, and took hold of the first of the posts, but he said that the people were crowding him down, and that he had to step from the string piece with his left foot. At or about that moment, or as soon as the boat touched the bridge, and the defendants' employee called to the drivers of the vehicles to drive out, a wagon came along. The bridge, which was a chain, and not a floating bridge, was not upon a level with the boat, but was about eight or nine inches higher; and as the wagon came along, the horse struck against the bridge, and could not get on it, as the boat was lower. As the witness Evarts described it, the horse rushed against the bridge. The boat, she says, was wet, which made the horse slip; and, as she further describes it, the animal first stepped forward to the bridge, and then fell down. And another witness says, that his attention being attracted by a considerable noise, he turned around, and saw a horse jump up; and another saw it stumble and fall down. At this instant the plaintiff was seen by witnesses, who say that he could not move either to the right or to the left; that his left foot was on one side of the string piece, and his right foot upon the other, without its being in his power to move either way. The axle of the cart came against him, the horse fell upon him, crushing his foot, and he fell backward across the string piece, when he was taken up by some gentlemen, with his foot hanging loosely from his leg. It further appeared that there had been a great increase of business at this ferry, in consequence of its having been made the terminus of the Morris and Essex Railroad about six months before the happening of the accident; an increase, according to the statement of one of the witnesses, beyond the greatest capacity of the defendants to accommodate. It also appeared that the defendants, after the accident, made an important arrangement for the security of passengers. This change consisted in putting up a fence

along the bridge, separating the passengers going to the boat from those coming from it; by means of which fence or inclosure those going to the boat are compelled to wait on the bridge, or in the waiting room, until the passengers and vehicles have left the boat, when the gate is opened, and those in the inclosure go on board. This alteration, says the witness Wehle, was evidently made in order to prevent such accidents. Before it was made, there were no barriers, so that the passengers going to the boat came in contact with those coming from it, and were frequently in jeopardy of their lives. Those going to it always went on the lower end of the bridge, which prevented the speedy discharge of passengers and vehicles from the boat, and caused crowding and confusion. I think it is fairly inferable, from the evidence, that the direct cause of the accident was the fact, that when the order was given to drive out, the boat was not up to the level of the bridge, which caused the horse, as he advanced, to stumble and fall. Being a chain bridge, I suppose it could be raised or lowered, to bring it, with the rising or falling of the tide, to the level of the boat. If it could, it was an act of negligence on the part of the defendants' servant to order the vehicles to be driven out, while the boat was eight or nine inches below the level of the bridge; or, if the bridge was immovable, so that it could not be uniformly brought to the level of the boat, it was an act of negligence on the part of the defendants to have such a structure. The subsequent changes which were made show, also, that at a ferry, so crowded with business as this, proper precautions had not been taken for the safety and security of passengers; and that, if the arrangement which the defendants afterward made, had existed at this time, a serious accident like this would not have occurred. That there was negligence on their part is, I think, very clear; and it only remains to consider whether there was mutual, or that co-operating negligence on the part of the plaintiff, which contributed to, and without which the accident could not have happened. It would be assuming too much to say that he was guilty of negligence by the mere act of going upon the bridge; and all that occurred afterward, so far as he was concerned, was involuntary. He

Hazman v. The Hoboken Land and Improvement Company.

swears expressly that he was pushed down to the end of the bridge, and upon the boat; and it was proved by other witnesses that he could not advance upon the boat, but was pushed back, and forced into the position in which he stood, unable to move to the right or to the left, when the horse, retreating from the bridge, stumbled and fell upon him. It was in evidence, that a great many persons were rushing on to the boat, and off it; and that the plaintiff was impelled or pushed forward by one class of passengers, and checked as he advanced by another, until he was so wedged in as to be unable to move. It was not by his own act, therefore, but by the act of others that he was placed in this position, and that such a state of things should have occurred, was attributable to the defendants' neglect to adopt some such arrangement for the ingress and egress of passengers as the one to which they afterward resorted, and which, it is evident, is effectual to prevent the recurrence of such scenes. For these reasons, I think there was sufficient in the case to go to the jury (*Bernhardt* v. *Renssalaer and Saratoga Railroad Co.* 32 Barb. 168, 169; *Smith* v. *New York and Harlem Railroad Co.* 19 N. Y. 127, 133; *Edgerton* v. *The Same*, 35 Barb. 193, 198; *Brown* v. *New York Central Railroad Co.* 31 Barb. 385; *Caldwell* v. *Murphy*, 1 Duer, 241; *Alden* v. *New York Central Railroad Co.* 26 N. Y. 102; *Buel* v. *The Same*, 31 N. Y. 319).

CARDOZO, J., concurred.

BRADY, J.—Although I still adhere to the opinion that this is a case of concurring negligence, in deference to the opinion of my brethren, I concur with them in ordering a new trial.

Judgment reversed, and new trial ordered.